1
2
3
4
5
6
7
8
9
10
11

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 12  ADAN MARTINEZ CASTILLO, | 1:10-CV-02312 AWI GSA HC |
| 13                    Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF |
| 14       v. | HABEAS CORPUS |
| 15  GREG LEWIS, Warden, | |
| 16                    Respondent. | |
| 17  _____/ | |

        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus
pursuant to 28 U.S.C. § 2254.

## BACKGROUND

        Petitioner is currently in the custody of the California Department of Corrections pursuant
to a judgment of the Superior Court of California, County of Tulare, following his conviction by
jury trial on October 21, 2008, of four counts of premeditated attempted murder (Cal. Penal Code
§§ 187a, 664), and one count of shooting at an inhabited dwelling (Cal. Penal Code § 246).
(See Resp't's Answer, Ex. A.)  Gang enhancements were also determined to be true.  (Id.)
Petitioner was sentenced to serve an aggregate indeterminate term of 60 years to life in state
prison. (Id.)

1   Petitioner filed a timely notice of appeal.  On July 30, 2010, the California Court of

2   Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

3   decision.  (Id.)  On August 4, 2010, Petitioner filed a petition for rehearing in the Fifth DCA.

4   (LD[1] 4.)  The petition was summarily denied on August 11, 2010.  (LD 5.)  Petitioner then filed a

5   petition for review in the California Supreme Court.  (LD 6.)  The petition was summarily denied

6   on September 29, 2010.  (LD 7.)

7   On December 13, 2010, Petitioner filed the instant federal habeas petition.  He presents

8   the following claims for relief: 1) He claims the trial court erred in denying his Batson/Wheeler

9   challenge when it failed to analyze the prosecutor's explanations according to Batson's third

10  step; and 2) He claims the evidence was insufficient to support the gang  enhancement.  On May

11  2, 2011, Respondent filed an answer to the petition.  Petitioner did not file a traverse.

12  **STATEMENT OF FACTS[2]**

13  Pauline Torres was waiting for friends outside an apartment complex in
    Porterville, when defendant and his brother, codefendant David Martinez Castillo
14  (collectively, defendants), drove up in a white Lincoln Town Car and accosted her. After
    Torres said no to their invitation to attend a party, defendants put their car in park and
15  said, "We ain't scared."

16  Around this time, Torres's friends returned and started arguing with defendants.
    One of Torres's friends, David Garcia, was required to register as a northern gang member
17  and another, Andrew Campos, was known to associate with northerners.[FN3] During the
    argument, Campos called defendants "Scraps." This appeared to anger defendants, who
18  peeled out in their car and said "Puro sur."

19  FN3. Witnesses referred interchangeably to northern and Norteño, and southern
    and Sureño; however, they primarily referred to these rival Hispanic gangs by
20  their English names.

21  Less than two minutes later, defendants drove back to the apartment complex and
    one of them started shooting at the group standing in front. The shooter repeated "Puro
22  sur" a number of times during the shooting. Bullets struck and injured Garcia, Campos,
    Campos's brother, Alexander Campos, and Campos's nephew, Aaron. A .22-caliber bullet
23  went through the wall of the apartment building and was found inside a tenant's mattress.

24  A week after the shooting, Alexander Campos took his brother to a drug testing
    center. As he was backing out, he saw defendants in their car. They were laughing and
25  one of them put his fingers in the shape of a gun and acted like he was going to shoot

26  _____

27  [1]"LD" refers to the documents lodged by Respondent with his answer.

28  [2]The Fifth DCA's summary of the facts in its July 30, 2010, opinion is presumed correct. 28 U.S.C.
    §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

2

1    Alexander again. Alexander had his daughter, daughter-in-law, and grandchildren, who
2    were in the car with him, duck down and pulled into a nearby police station, where he
     spoke with a detective.

3            After obtaining a search warrant, the police searched defendants' residence and a
     white vehicle at the residence. A blue bandana was found folded neatly on the front seat
4    of the vehicle. The police also found a .22-caliber revolver in a storage shed behind the
     backyard. At that time, defendants were questioned by a police detective. After waiving
5    their rights, defendant admitted that he associated with southern gang members and his
     brother admitted that he was an active southern gang member.
6
             Detective Mark Knox testified as a gang expert for the prosecution during the jury
7    trial of the substantive offenses and during the separate court trial of the gang
     enhancements. During the jury trial, Detective Knox testified, among other things, that
8    "scrap" is a "derogatory term that northern gang members have created for a southern
     gang member." He explained the term is "insulting to a southern gang member" and
9    opined that, if someone were to call a southern gang member a "scrap," the southerner
     would "probably fight for the southern gang."
10
             When asked what shouting the words "Puro sur" might mean, Detective Knox
11   testified: "Poros is a slang term that Hispanic gang members use, whether it be north or
     south, for Porterville, because it's P-O-R-O-S. Sur is the Spanish word for south, S-U-R."
12   After the prosecutor clarified the first word was "puros" not "poros," Detective Knox
     testified: "I'm not sure what puro means, but maybe south side. But I know that sur is
13   absolutely, positively south." When again questioned about the the significance of the
     words "Puro sur," Detective Knox responded: "I would say that it would be somebody
14   representing the southern Hispanic gang culture."

15           During the court trial of the gang enhancements, Detective Knox opined that both
     defendants were members of the southern gang. His opinion was based, in part, on reports
16   that defendants had identified themselves as southerners during previous jail bookings.
     After being presented with two hypothetical scenarios based on the facts of this case,
17   Detective Knox opined the crimes would benefit the southern gang and the individual
     gang members who committed the crimes.
18
             In the defense case, defendants and other witnesses testified that defendants were
19   somewhere other than the Porterville apartment complex at the time of the shooting.

20   (See Resp't's Answer, Ex. A.)

21                                       **DISCUSSION**

22   I.    Jurisdiction

23           Relief by way of a petition for writ of habeas corpus extends to a person in custody

24   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

25   or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

26   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered

27   violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises

28   out of Tulare County Superior Court, which is located within the jurisdiction of this Court. 28

                                               3

U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

II.   Standard of Review

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade,  538 U.S. 63, 70 (2003).  Under the AEDPA, a petitioner can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at

1   72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may

2   grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme]

3   Court on a question of law or if the state court decides a case differently than [the] Court has on a

4   set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S.

5   at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the

6   state court identifies the correct governing legal principle from [the] Court's decisions but

7   unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

8        "[A] federal court may not issue the writ simply because the court concludes in its

9   independent judgment that the relevant state court decision applied clearly established federal

10  law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.

11  A federal habeas court making the "unreasonable application" inquiry should ask whether the

12  state court's application of clearly established federal law was "objectively unreasonable." Id. at

13  409.

14        Petitioner has the burden of establishing that the decision of the state court is contrary to

15  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

16  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

17  states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

18  state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

19  01 (9th Cir.1999).

20        AEDPA requires that we give considerable deference to state court decisions. "Factual

21  determinations by state courts are presumed correct absent clear and convincing evidence to the

22  contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

23  factual determination will not be overturned on factual grounds unless objectively unreasonable

24  in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

25  Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

26  findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

27  393 F.3d 943, 976-77 (2004).

28  III.    Review of Claims

A.  Batson/Wheeler Challenge

In his first claim, Petitioner alleges the trial court erred in denying his Batson/Wheeler challenge by failing to meaningfully evaluate the prosecutor's stated reasons under the third step of the Batson test.

This claim was presented on direct appeal to the Fifth DCA which denied the claim in a reasoned decision. (See Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the California Supreme Court, where it was rejected without comment.  (LD 6,7.)  When the California Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n. 3 (1991).  In this case, the appellate court analyzed and rejected the claim as follows:

> Defendant contends the prosecutor improperly exercised peremptory challenges to excuse six prospective jurors because of their race in violation of the state and federal constitutions. As a result, he argues, the trial court erred in denying his *Wheeler/Batson* motion during jury selection.
>
> The use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution (*Wheeler, supra,* 22 Cal.3d at pp. 276-277), as well as the equal protection clause of the Fourteenth Amendment to the United States Constitution (*Batson, supra,* 476 U.S. at p. 89; *People v. Burgener* (2003) 29 Cal.4th 833, 863 (*Burgener* )). "A party who suspects improper use of peremptory challenges must raise a timely objection and make a prima facie showing that one or more jurors [have] been excluded on the basis of group or racial identity.... Once a prima facie showing has been made, the prosecutor then must carry the burden of showing that he or she had genuine nondiscriminatory reasons for the challenges at issue. [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 993.) At that point, the trial court must decide whether the opponent of the challenge has proved purposeful discrimination. (*People v. McDermott* (2002) 28 Cal.4th 946, 971 (*McDermott*).)
>
> The trial court's ruling on this issue is reviewed for substantial evidence and with great restraint. (*McDermott, supra,* 28 Cal.4th at p. 971.) "We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal." (*Burgener, supra,* 29 Cal.4th at p. 864.) In carrying out this obligation, the trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's nondiscriminatory reason for exercising a peremptory challenge is being accepted by the court as genuine. This is particularly true where the prosecutor's nondiscriminatory reason for exercising a peremptory challenge is based on the prospective juror's demeanor, or similar intangible factors, while in the courtroom. (*People v. Reynoso* (2003) 31 Cal.4th 903, 919.)

At the end of the first day of jury selection in this case, defense counsel made a *Wheeler/Batson* motion on the ground the prosecutor improperly used three of six peremptory challenges to exclude Hispanic prospective jurors. After finding a prima facie showing of discrimination had been made, the trial court invited the prosecutor to state his reasons for excluding these prospective jurors. The prosecutor explained he excused Prospective Juror No. 4 [FN4] because she had no prior jury experience and because she said her brother had recently been released from jail for a gang-related crime. Prospective Juror No. 2 was excused because he said his father and cousin were in jail. Prospective Juror No. 8 was excused because he said he had friends who had been arrested for attempted murder. After listening to the prosecutor's reasons, the trial court denied the *Wheeler/Batson* motion, finding "the prosecutor has race-neutral reasons for excluding those particular jurors."

> FN4. For the sake of convenience and privacy, we refer to the excused jurors by their seat numbers.

On the second and final day of jury selection, after the prosecutor used eight more peremptory challenges to exclude prospective jurors, defense counsel renewed the *Wheeler/Batson* motion on the ground the prosecutor improperly used two peremptory challenges to exclude Hispanic jurors and one peremptory challenge to exclude an African-American juror. The trial court again found a prima facie showing had been made and asked the prosecutor to explain his reasons for excusing the jurors. The prosecutor explained he excused first Prospective Juror No. 14 because he said he had two brothers who had served prison terms. In response, the trial court stated: "Yeah, that was real clear to the Court that that wasn't based on race. The fact that he had two brothers that were involved in gangs, clearly any prosecutor wouldn't leave them on." As to Prospective Juror No. 1, the prosecutor explained: "[S]he said her dad was arrested. I feel her experience with her father and-well, the experience of her father and with the police might prejudice her with our witnesses." The court replied: "Yeah, I find a race-neutral reason to exclude her, also." As to the second Prospective Juror No. 14 excused, the prosecutor explained he excused the African-American juror because "she said she works for a group home, and she also has family-I believe she said her family shot at people. I feel that might prejudice our case." [FN5] The trial court then noted she had been arrested and the prosecutor acknowledged this was another reason he had excused her. The trial court concluded: "Again, I don't think there's any prosecutor that's going to leave her on the jury panel, either, because of that background. So I find there is a race-neutral reason to exclude her."

> FN5. Specifically, second Prospective Juror No. 14 stated that she and her husband ran a "state parole group home," she had arrests in Tulare and Fresno Counties but "[e]verything has now been dismissed," and over 30 years ago she had distant cousins who were involved in a gang and shot and killed victims.

On appeal, defendant recognizes the prosecutor articulated nondiscriminatory reasons for excusing the prospective jurors in question, and that these reasons are supported by the record. He claims, however, the trial court committed reversible error by failing to evaluate meaningfully the prosecutor's explanations and simply accepting "at face value the prosecutor's preferred reasons as race-neutral[.]" Defendant also faults the court for failing to make "specific findings based on courtroom observations of juror demeanor or other percipient facts" and asserts that "several of the sworn jurors exhibited similar traits to those excused, including some with relatives who had been arrested/prosecuted and many who had never served on a jury before." Defendant concludes: "Had the court evaluated the prosecutor's responses in light of all the circumstances of the jury selection, it would have been clear that the proffered reasons were pretexts to excuse the five Hispanic jurors and the sole African-American juror."

We find defendant's arguments unpersuasive. First, we have found no basis in the record for concluding the trial court failed to make a sincere and reasoned effort to evaluate the prosecutor's nondiscriminatory reasons for excusing the prospective jurors. Although not required to do so, the trial court made a number of *specific* comments detailing *facts* which supported the prosecutor's reasons for excusing the jurors and the trial court's finding they were genuinely race neutral. The court's comments indicate it independently evaluated the jurors' responses during voir dire and contradict defendant's assertion that the court accepted the prosecutor's explanations at face value.

Second, defendant's invocation of comparative juror analysis fails to demonstrate the prosecutor's reasons were pretextual. Despite asserted similarities, a number of the sworn jurors defendant discusses also had characteristics the prosecutor could have reasonably viewed as potentially favoring the prosecution. For example, although sworn Juror No. 904128 said she had a brother who had been arrested, she also said she had a son-in-law who was a police officer and a niece who worked as a courtroom clerk in the same courthouse where defendants were being tried. In addition, she had watched her niece on television reading jury verdicts.

Juror No. 801205, a self-employed farmer, who disclosed that he had a family member involved in a similar criminal trial, expressed negative views of gang members, which likewise could have been construed as favorable to the prosecution. At one point, Juror No. 801205 stated: "Well, I don't like gangs and I don't like what they stand for. Like I said, I'm self-employed. If they worked for me, they wouldn't have enough time to go do drive-by's." Later, when asked about whether he might have a problem judging someone, Juror No. 801205 stated: "I don't necessarily, you know, judge people, but I mean, there's that little thing that goes behind your head when you see somebody with tattoos or earrings or anything else."

We have carefully reviewed the other comparisons urged by defendant and find none necessarily demonstrates purposeful discrimination by the prosecutor. Because substantial evidence supports the prosecutor's nondiscriminatory reasons for excusing the prospective jurors in question, we reject defendant's challenge to the trial court's rulings on his *Wheeler/Batson* motion.

(See Resp't's Answer, Ex. A.)

Evaluation of allegedly discriminatory peremptory challenges to potential jurors in federal and state trials is governed by the standard established by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 89 (1986).

In Batson, the United States Supreme Court set out a three-step process in the trial court to determine whether a peremptory challenge is race-based in violation of the Equal Protection Clause. Purkett v. Elem, 514 U.S. 765, 767 (1995). First, the defendant must make a prima facie showing that the prosecutor has exercised a peremptory challenge on the basis of race. Id. That is, the defendant must demonstrate that the facts and circumstances of the case "raise an inference" that the prosecution has excluded venire members from the petit jury on account of their race. Id. If a defendant makes this showing, the burden then shifts to the prosecution to provide a race-

neutral explanation for its challenge. Id. At this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id., *quoting* Hernandez v. New York, 500 U.S. 352, 360 (1991).  Finally, the third step requires the trial court to determine if the defendant has proven purposeful discrimination.  And "[s]ince the trial judge's findings in the context under consideration here largely turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." Batson, 476 U.S. at 98, n.21.

In this case, Petitioner contends that the prosecutor's reasons were pretextual. This allegation thus implicates Batson's third step, where the court evaluates whether the defendant has met the burden of showing purposeful discrimination in light of the proffered justifications. Kesser v. Cambra, 465 F.3d 351, 359 (9th Cir.2006) (*en banc*); Batson, 476 U.S. at 98.

On the first day of jury selection, the prosecutor struck six jurors from the venire. Petitioner made a prima facie showing that the prosecutor excused three of the six jurors on the basis of race. The trial court stated that an inference was raised and asked the prosecutor to provide the reason for the dismissal. The burden then shifted to the prosecutor to provide a race-neutral reason. The prosecutor stated that he excused Prospective Juror Gutierrez because she had never served on a jury before and because she stated her brother had been incarcerated for a crime. (CRT[3] 19-20.)  She admitted the crime was similar, and when asked if there was anything that would cause her concern in the this case, she stated, "Maybe 'cause it's a little fresh. It's - - it had to do with gang - - something having to do with gangs, as well." (CRT 20.)  The prosecutor stated he excused Prospective Juror Sierra, because his father was currently incarcerated and his cousin had been involved in a similar crime. (CRT 18.)  The prosecutor challenged Prospective Juror Anaya, because Mr. Anaya stated he had a few friends who had been arrested for the same charges of attempted murder. (CRT 22.)  The trial court denied the Batson/Wheeler motion finding the prosecutor had race-neutral reasons for excluding these jurors. (CRT 113.)

On the second day of jury selection, the prosecutor used eight more peremptory

[3]"CRT" refers to the Corrected Reporter's Transcript on Appeal.

1  challenges.  The defense renewed the <u>Batson/Wheeler</u> motion based on the challenge to two

2  prospective Hispanic jurors and one African-American juror.  The prosecutor stated he excused

3  Prospective Juror Torres, because Mr. Torres had stated that his two younger brothers had served

4  time in prison, one of them having been convicted of a similar gang-related crime. (CRT 121-

5  122.)  When Mr. Torres was asked whether he could be fair, he stated, "Yeah, I guess." (CRT

6  122.)  Prospective Juror Ms. Torres stated her father had been arrested, and she stated she had no

7  prior jury experience. (CRT 151.)  Prospective Juror Little stated she and her husband ran a state

8  parole group home. (CRT 152.)  Ms. Little admitted that cousins of hers had been involved in a

9  similar gang incident thirty years prior, and in that incident her cousins had shot and killed

10 someone. (CRT 152-153.)  She also stated that ten to fifteen years ago, she had been held at

11 gunpoint. (CRT 153.)

12      The trial court again found the prosecutor's reasons were race-neutral.  (CRT 165-166.)

13 The trial court also determined that the prosecutor's reasons were well founded.  (CRT 166.)

14 The trial court stated that no prosecutor would leave some of the jurors on the panel based on

15 their statements. (CRT 166.)  Nevertheless, Petitioner complains that comparative juror analysis

16 shows the prosecutor's explanations were only a pretext for racially-motivated reasons.

17      The appellate court determined that comparative juror analysis failed to demonstrate the

18 prosecutor's reasons were pretextual.  The court noted that although several sworn jurors had

19 similarities to the challenged jurors, the sworn jurors also had characteristics that were

20 potentially favorable to the prosecution.  For example, one sworn juror that had been arrested

21 also had a son-in-law who was a police officer and a niece who was a courtroom clerk in the

22 same courthouse where the defendants were being tried.  Another sworn juror who had disclosed

23 he had a family member who was involved in a similar criminal trial also stated he viewed gangs

24 negatively.  When that juror was questioned about his views, he stated: "Well, I don't like gangs

25 and I don't like what they stand for. Like I said, I'm self-employed. If they worked for me, they

26 wouldn't have time to go do drive-by's." (<u>See</u> Resp't's Answer, Ex. A.)  When asked about his

27 judgment, he stated: "I don't necessarily, you know, judge people, but I mean, there's that little

28 thing that goes behind your head when you see somebody with tattoos or earrings or anything

1    else." (See Resp't's Answer, Ex. A.)

2        On direct review, the trial court's determination regarding the prosecutor's proffered

3    reasons is entitled to "great deference," Batson, 476 U.S., at 98, n. 21, and "must be sustained

4    unless it is clearly erroneous." Snyder v. Louisiana, 552 U.S. 472, 477.  On federal habeas

5    review, "AEDPA 'imposes a highly deferential standard for evaluating state-court rulings" and

6    "demands that state-court decisions be given the benefit of the doubt.'" Felkner v. Jackson, __

7    U.S. __, __, 131 S.Ct. 1305, 1307 (2011), *quoting,* Renico v. Lett, 559 U.S. __, __, 130 S.Ct.

8    1855, 1862 (2010).  In this case, the state appellate court decision was plainly not unreasonable.

9    The record did not reflect different treatment between comparably situated jurors.

10       Petitioner fails to demonstrate that the state court rejection of his claim "resulted in a

11   decision that was contrary to, or involved an unreasonable application of, clearly established

12   Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

13   The claim should be denied.

14       B.  Insufficiency of Evidence of Criminal Street Gang Enhancement

15       In his second ground for relief, Petitioner claims the evidence was insufficient to support

16   the allegation that he committed the murder in furtherance of a criminal street gang.  He states

17   the evidence only showed that he had contact with gang members while in the company of his

18   brother David.  He claims the evidence presented by the gang expert only condemned him for his

19   family associations; it did not support the finding that he himself acted with the specific intent

20   and knowledge to benefit a gang.

21       Petitioner also presented this claim on direct appeal to the Fifth DCA where it was

22   rejected in a reasoned decision.  (See Resp't's Answer, Ex. A.)  Petitioner then presented the

23   claim to the California Supreme Court in a petition for review and it was denied without

24   comment.  (LD 6,7.)  As previously stated, when the California Supreme Court's opinion is

25   summary in nature, the Court must "look through" that decision to a court below that has issued a

26   reasoned opinion.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA analyzed the claim as

27   follows:

28       Defendant next contends insufficient evidence supports the trial court's true

findings on the gang enhancements attached to each of the substantive counts.

In reviewing the sufficiency of the evidence we view the evidence in a light most favorable to the judgment. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *People v. Augborne* (2002) 104 Cal.App.4th 362, 371 [standard of review of sufficiency of the evidence applies to criminal street gang enhancement].) We discard evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient verity. (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.) We have no power on appeal to reweigh the evidence or judge the credibility of witnesses. (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.) We must affirm if we determine that any rational trier of fact could find the elements of the crime or enhancement beyond a reasonable doubt. (*People v. Johnson, supra,* at p. 578.)

The criminal street gang enhancement of section 186.22, subdivision (b)(1), applies if the crime for which the defendant was convicted was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." The enhancement may be satisfied if the evidence establishes that defendant intended to commit the crime in association with other gang members. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [jury may "reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members"].) "[O]ne gang member would choose to commit a crime in association with other gang members because he could count on their loyalty." (*Id.,* at p. 1197.)

Defendant's argument on appeal focuses on the specific intent element of the gang enhancements. He claims the only evidence on the purpose or motive for the shooting came from the "generic" opinion testimony of the prosecution's gang expert, which he says unfairly "condemned" him for his association with his gang-member brother and the evidence failed to show that he personally "himself acted with the specific intent and knowledge to benefit a gang."

Contrary to defendant's assertions, there was more evidence than Detective Knox's opinion to support the specific intent requirement of the gang enhancements. The most compelling evidence of defendant's intent consisted of the events prior to the shooting. Defendants, *both* of whom admitted to being a member or associate of the southern gang, were involved in a verbal altercation with two of the shooting victims, who were themselves members or associates of the rival northern gang. During the altercation, the victims called defendants "Scraps," an insult used by northerners against southerners. Defendants became angry and said "Puro sur," an expression representing their allegiance to the southern gang. When defendants returned to the apartment complex, one was heard to repeat "Puro sur" while firing at the victims. This evidence supports a reasonable inference that the confrontation between defendants and the victims was motivated by gang rivalry and belies defendant's suggestion that it merely involved a "dispute ... over the attentions of a girl." When combined with the gang expert's testimony, the evidence was more than sufficient to establish defendant committed the crimes "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (§ 186.22, subd. (b)(1).) [FN6]

FN6. We have reviewed the Ninth Circuit and California state cases defendant relies on and find them inapposite because, contrary to defendant's assertions, there was more than just "an officer's bare, unsupported opinion" or his association with his brother supporting the gang enhancements in this case. Rather, for reasons discussed above, there was substantial evidence linking defendant and his motives to the southern gang. Accordingly, we reject defendant's assertions that, "[h]ad [he] been tried alone, he would not have been

1  found to have acted to benefit the gang" and that "it violates [defendant's] First
   Amendment rights to sentence him under the gang statute merely because of his
2  association with a close family member."

3  (See Resp't's Answer, Ex. A.)

4  The law on insufficiency of the evidence claim is clearly established.  The United States

5  Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must

6  determine whether, viewing the evidence and the inferences to be drawn from it in the light most

7  favorable to the prosecution, any rational trier of fact could find the essential elements of the

8  crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency

9  claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas

10 review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen,

11 408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision was

12 an unreasonable application of the Jackson standard.

13 Pursuant to Cal. Penal Code § 186.22(b), "any person who is convicted of a felony

14 committed for the benefit of, at the direction of, or in association with any criminal street gang,

15 with the specific intent to promote, further, or assist in any criminal conduct by gang members"

16 is punishable with an additional prison term.  In this case, there was substantial evidence from

17 which a rational jury could determine that Petitioner committed the murder in association with a

18 criminal street gang with the specific intent to promote, further, or assist his fellow gang

19 members. Petitioner complains that the only gang evidence came from his association with his

20 brother and the opinion of the gang expert.  Not so.

21 The record shows Petitioner had admitted to investigating officers during booking that he

22 was an active member of the Surenos gang.  (RT[4] 263, 541, 544, 570.)  There was also evidence

23 that the shooting victims were members of the Norteno gang. (RT 71, 294.)  There was evidence

24 that gang slurs were traded back and forth between the victims and Petitioner and his co-

25 defendant. (RT 221.)  The victims called Petitioner and his co-defendant "scraps," which is a

26 derogatory term Norteno gang members use for a Sureno gang member. (RT 221, 294-295, 300.)

27

28
_____
[4]"RT" refers to the Reporter's Transcript on Appeal.

The record also shows that during the commission of the crime Petitioner and his co-defendant repeated the gang slur, "Puro sur," which is a term associated with the Sureno gang. (RT 87, 91-92, 289.)  During a search of the vehicle that was used in the crime, detectives discovered a blue bandanna folded neatly on the front seat. (RT 258.)  A blue bandanna is commonly used by Sureno gang members to show their gang affiliation.  (RT 288, 293.)  Petitioner acknowledged the vehicle was his. (RT 263.)

Therefore, Petitioner's arguments regarding the state of the evidence is not persuasive. The gang evidence did not consist solely of expert testimony.  As set forth above and in the appellate court's opinion, there was ample evidence apart from the gang expert's testimony from which a rational jury could find beyond a reasonable doubt that Petitioner committed the offense in association with a gang with the specific intent to promote, further, or assist his fellow gang members.  Petitioner fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or an "unreasonable determination of the facts in light of the evidence."  The claim should be rejected. 28 U.S.C. § 2254(d).

## RECOMMENDATION

Accordingly, the Court HEREBY RECOMMENDS that this action be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th

1    Cir. 1991).

2

3        IT IS SO ORDERED.

4        **Dated:**   **August 30, 2011**              **/s/ Gary S. Austin**
                                                       UNITED STATES MAGISTRATE JUDGE
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28